Gough v. Dennis.

## GOUGH *vs.* DENNIS.

Defendant offered to sell a $500 note of an insolvent bank to C., a broker, who declined buying and said (in substance) that he had two days before bought a $500 note of the same bank at five per cent discount, that he had no doubt that he had been cheated out of the money he gave for it, and that he supposed there was fraud in connection with those notes. Defendant then offered the note for sale to three other brokers, all of whom declined buying, saying (in substance) that the note was bad and that there was no sale for it. Defendant then sold the note to plaintiff, telling him either that C. had offered to take the note at five per cent discount, or that C. had taken a similar note two days before, but saying nothing about what the other three brokers had told him.

*Held*, in an action on the case, that defendant's account of C.'s conversation with him, whichever form of expression he represented C. to have used, was not true in a legal sense ; and that the omission to disclose what the three other brokers had said, was a fraudulent suppression of the truth, for which the defendant is liable.

In any possible construction of what defendant told when narrating what C. had said, he violated the obligation to speak the truth, which means the whole truth. *Per* COWEN, J., citing *Gough* v. *St. John*, 16 Wend., 651.

When a man who desires to put off his goods undertakes to recommend them in any way, knowing of a secret defect which destroys their value in the market, he can not be said in law to make a true representation unless he discloses the defect.

CASE for fraudulent representations to the plaintiff, a broker, as to a $500 bill on the bank of Millington, Maryland, a bankrupt institution, by which the plaintiff was induced to advance $478.25 as the purchase money of the bill, and for a fraudulent and artful concealment of facts material to the value of the bill.

The plaintiff's clerk, J. T. Gough, testified that, October 19th, 1840, the defendant offered him the bill at Albany, at

plaintiff's office there.   The defendant told the witness that one Calder, a Troy broker, had offered to purchase it at five per cent discount.   The form of the witness's testimony as to the representation was thus stated in the case : " He said Calder had wanted to purchase it at five per cent, or to take it at five per cent discount, or that he, Calder, offered to take it at five per cent discount.   He said he wanted to charge five per cent for it, or to take it at five per cent discount."   The defendant made no statement of any thing he had learned as affording a reason for questioning the goodness of the bill.

Calder testified as to what he in fact told the defendant. It was that he, the witness, had bought a $500 bill on the Millington bank at five per cent discount, and had no doubt he had been taken in.   That some person had brought out the bills to impose upon people ; that he supposed there was fraud in there being so large bills in market.   The defendant spoke of sending the bill to New York and putting it off, saying nothing about it ; and desired to know whether he would thus make himself liable.   The witness expressed an opinion he would not.   He further remarked to the defendant that he (witness) had bought a $500 Millington bill on the 17th October (two days before), without reflection, and had no doubt he had been cheated out of the money he gave for it.   This was about 9 A. M. of the 19th of October.

B. Marsh, a witness for the defendant, was present at the sale of the bill, and gave a version of the conversation somewhat different from Gough.   He thought the defendant said no more than that Calder had taken a $500 bill on the same bank the Saturday before.   On his cross-examination, this witness stated that before the defendant offered the bill to the plaintiff's clerk, he went with the witness to the office of three several brokers, who, on the bill being offered, declined to discount it ; the first saying it was bad, or there was no sale for it according to one of the newspapers.   The second refered to a letter from New York stating that the writer must send back certain Millington bills as there was no sale for them in New York.   The third told them about the same as the two first.   The witness and defendant then

went to the plaintiff's office; neither of them letting the plaintiff know what they had learned from the three brokers.

The judge charged the jury that the question, whether the plaintiff had made out a cause of action in respect to the false representation alleged in the declaration, viz., *that Calder offered to take the bill at five per cent,* depended on the understanding the jury had of John T. Gough's testimony. Gough had testified that the defendant represented to him " either that Calder wanted to purchase, or offered to take the bill at five per cent discount, or that he wanted to charge five per cent discount, or to take it at five per cent discount. Witness could not be positive which form of expression the defendant used." That the defendant had a right to assume that the form of expression most favorable to him was used. Therefore, if the jury should be of opinion that either one of those forms of expression did not make out a false representation, the defendant would be entitled to their verdict. That the defendant was not bound to state what he had heard the other brokers say, as long as he did not make any false representations, and told the truth as far as he did make any statements. Verdict for defendant. Plaintiff moved for a new trial on a case made.

*By the Court,* COWEN, J. The defendant stated, without qualification, what clearly conveyed the idea that Calder had offered to take the bill at five per cent discount. This was a false account of the conversation, calculated to mislead the plaintiff's clerk; and it had the effect to mislead him. The representation was false in another respect. It should have been accompanied with the qualification, not only that the bills of the Millington bank had been explicitly condemned by Calder; but that they had also been condemned, and the bill in question rejected by other brokers. The case presented more than mere naked silence. The defendant alleged positively what, if he had told the whole truth, could not have deceived for a moment. He artfully disguised facts known to himself, and unknown to the plaintiff's clerk. What more effectual assertion of the bill being marketable at five per cent discount, than to say that Calder,

8

a respectable broker, had agreed to take it at that? or to say, in the version given by Marsh, that Calder had, but a little while before, given that for a like bill? This was but another form of asserting that the bill was worth 95 dollars on the hundred. Suppose the defendant had said so directly, knowing that it had been condemned and rejected by four experienced brokers; no one would doubt that such would have been a fraud for which he would have been legally answerable. He can not escape because he has adopted a more artful or indirect mode of conveying the same idea. Such representations are not tested by the rules of certainty required in special pleading. In any possible construction of what the defendant said, either according to Gough or Marsh, he violated the obligation to speak the truth, which means the whole truth. (*Gough* v. *St. John*, 16 Wend., 651, *and the cases there cited.*) It is not necessary to say what would be the legal consequence of mere silence in such a case. Even this would be a clear moral fraud; and I should be loth to suppose that the law would look upon it with indifference. But clearly when a man who desires to put off his goods undertakes to recommend them in any way, knowing of a secret defect which destroys their value in the market, he can not be said in law to make a true representation, unless he discloses the defect. Suppose a man, desirous of selling his horse, to represent that an experienced horse dealer had offered him a sound price, concealing at the same time that the horse itself was unsound, he either knowing or having strong reason, founded on credible information, to believe that the horse was in fact unsound. Should he succeed in his purpose of putting off the horse at the price mentioned, the transaction would form an obvious case for an action of deceit. He speaks with a view to influence the conduct of the purchaser; and is bound to communicate his knowledge or the information that raises a probability of unsoundness.

The question of variance between the declaration and proof does not arise.

Nor is it necessary to decide whether, where a witness for the plaintiff professes to recollect different forms of ex-

pression, the jury are, as a matter of course, bound to adopt the alternative most favorable to the defendant. It strikes me that it should be put to the jury as open for them to find which among the several forms is the true one, making, to be sure, such distinction in favor of the defendant as may be due from the apparent causes of bias against him. A direction to this effect would, in the case at bar, have perhaps come to about the same as the direction in fact given.

We should be unwilling to grant a new trial upon what would, perhaps, in the respect last mentioned, amount to very little more than a turn of expression, substantially right when applied to the particular case. But the learned judge went farther. After assuming that one of the forms of representation was to be taken, he made a doubt whether the form most favorable to the defendant might not have communicated the truth, adding that the defendant was not bound to bring forward the knowledge he had derived from other brokers, if he was literally correct as far as he went. Under the circumstances we think that in neither form of expression could the representation have been true in a legal sense; and that the omission to disclose what other brokers had said, was a fraudulent suppression of the truth for which the defendant is answerable.

On these grounds a new trial is granted, costs to abide event.